**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** ex rel. **ANDRE PETRAS**, | : : : |
| Plaintiff, | : : Civ. Action No.:13-2415 (FLW) (DEA) |
| v. | : : **OPINION** |
| **SIMPAREL, INC.**, **DAVID ROTH**, and **RON GRILLI**, | : : : : |
| Defendants. | : |

**WOLFSON**, **United States District Judge:**

This *qui tam* action is brought by Plaintiff Andre Petras ("Plaintiff"), who alleges that Defendants Simparel, Inc. ("Simparel"), David Roth, founder and Chief Technology Officer ("CTO") of Simparel, and Ron Grilli, Chief Executive Officer ("CEO") of Simparel, (collectively, "Defendants") have violated section 3729(a)(1)(G) ("Section 3729(a)(1)(G)") of the federal False Claims Act (the "FCA"), also known as the "reverse false claims" section. In a previous opinion, the Court dismissed with prejudice Plaintiff's other FCA claims against Defendants and former defendants, Log Logistics, LLC ("Log Logistics") and MontERP Enterprises. However, Plaintiff's remaining Section 3729(a)(1)(G) claim against Defendants was dismissed without prejudice for failure to sufficiently allege facts under which relief could be granted. Consequently, Plaintiff amended his Complaint to supplement his factual allegations regarding this cause of action. In the present motion, Defendants move to dismiss Plaintiff's remaining claims in their entirety. For the reasons set forth below, the Court grants Defendants' motion.

**I.     Background**

The following allegations are taken from Plaintiff's Amended Complaint and are assumed as true for the purposes of this motion to dismiss. Simparel is a privately held corporation, founded in November 2007 by Mr. Roth. Second Am. Compl. ¶ 12. Simparel designs software solutions for the apparel manufacturing industry and its primary asset is its proprietary Enterprise Resource Planning software (the "ERP Software"), which provides all-inclusive software solutions for the "specific needs of the fashion industry." *Id.* at ¶¶ 17-19. Both Mr. Roth and Mr. Grilli have held their respective offices as Simparel's CTO and CEO since December 2007. *Id.* at ¶¶ 39, 41. Plaintiff was Simparel's Chief Financial Officer ("CFO") from December 2007 to November 2012. *Id.* at ¶ 10.

One of Simparel's first investors, L Capital, is a private equity firm that was previously licensed by the Small Business Administration (the "SBA") as a small business investment company. *Id.* at ¶¶ 2-3, 52. The SBA provided L Capital with $90,000,000 in funds "through the purchase and/or guaranty of certain Participating Securities," $4,016,000 of which L Capital invested in Simparel. *Id.* In exchange for its investment, L Capital received Series A Preferred shares, currently representing a 37.88% interest in Simparel. *Id.*

Subsequently, L Capital failed to comply with the terms and conditions of its funding from the SBA. *Id.* at ¶¶ 71-72. As a result, the SBA brought an enforcement action against L Capital, and the SBA was appointed receiver of L Capital for the purpose of marshalling and liquidating all of L Capital's assets to satisfy the claims of L Capital's creditors.[1] *Id.* at ¶ 72, Ex. A p. 1.

---

[1] Plaintiff attaches to his Complaint a Consent Order of Receivership entered April 19, 2012 in Civil Action No. 00937-LAP by the United States District Court for the Southern District of New York, which finds that L Capital "violated the Small Business Investment Act, l5 U.S.C. 661

According to Plaintiff, as receiver, the SBA is now a stockholder in Simparel. *Id.* at ¶ 72. However, under the consent order attached as Exhibit A to the Complaint, L Capital itself was not dissolved, rather the SBA assumed full control and operation of L Capital until its holdings could be liquidated. *Id.* at Ex. A p. 5. Thus, L Capital's shares in Simparel are still held by L Capital, but L Capital is controlled by the SBA. *See id.*

Plaintiff alleges that after the SBA took control of L Capital, Defendants "conspire[d] to avoid or decrease Simparel's obligation to the SBA as a minority preferred shareholder by intentionally and knowingly decreasing the value of Simparel and using the intellectual property and assets of Simparel for their own benefit." *Id*. at ¶ 4. According to Plaintiff, the obligation owed to the SBA is accrued dividends of approximately $1,208,000 and $888,000, that are payable to the holders of Simparel's Series A stock upon either 1) a declaration by Simparel's board of directors (the "Board") or 2) any involuntary or voluntary liquidation, dissolution, or windup of Simparel. [2] *Id.* at ¶¶ 1, 29, 96. If these dividends were to ever pay out, they would be distributed to SBA as receiver for L Capital, and then in turn to L Capital's creditors. *Id.* at ¶¶ 97-

---

*et seq*., and the regulations promulgated thereunder at 13 C.F.R. § 107.1 *et seq.*" and appoints the SBA as receiver to L Capital. Second Am. Compl. Ex. A p. 1. This Court may consider this exhibit, because "[g]enerally, in ruling on a motion to dismiss, a district court relies on the complaint, attached exhibits, and matters of public record." *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citing *Pension Benefit Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

[2] Plaintiff also alleges that Simparel's obligations include "(i) keeping the [Board] informed of all material matters; (ii) maintaining a duty of loyalty by not conspiring to solicit customers and company employees through other entities; (iii) not using trade secrets to compete against the company and (iv) not participating in an unauthorized vertical business to the detriment of [Simparel]." Second Am. Compl. ¶ 4. However, in my previous opinion in this matter, I dismissed Plaintiff's claims regarding these obligations, because they are outside the scope of the FCA's definition of obligation--they do not require payment of money or property to the Government. *U.S. ex rel. Petras v. Simparel, Inc.*, No. CIV.A. 13-2415 FLW, 2015 WL 337472, at *6 (D.N.J. Jan. 26, 2015). I will not reconsider these claims here.

98, Ex. A. pp. 1-2. Plaintiff alleges that Defendants attempted to avoid or decrease payment of these dividends, by (1) establishing a competing company which uses Simparel's proprietary ERP software without compensating Simparel, potentially depleting Simparel's resources to the point that it would be unable to pay the dividends; (2) intentionally withholding financial information from the SBA and other shareholders to prevent them from dissolving the company; and (3) failing to hold required Board meetings and intentionally delaying the appointment of new members to the Board to prevent the Board from ordering the payment of the dividends or the windup of the company. *Id.* at ¶¶ 5-6, 46, 102-103.

In October 2011, Mr. Roth formed the company Log Logistics. *Id.* at ¶ 44. Mr. Roth's employment agreement with Simparel allows him to form a "vertical company," or a company that makes use of the ERP Software, without competing with Simparel. *Id.* at ¶¶ 5, 44-46. However, Plaintiff alleges that Log Logistics uses the ERP Software in direct competition with Simparel, and even services former Simparel customers. *Id.* at ¶¶ 44-46. Log Logistics pays Simparel no royalty fees for the use of the ERP Software. *Id.* at ¶¶ 84, 86. Further, Plaintiff alleges that, in violation of his employment contract with Simparel, Mr. Roth neglected to inform the Board of his plans to form Log Logistics. *Id.* at ¶ 85. Plaintiff claims that Defendants have potentially avoided or decreased the payment of any accrued dividends to Simparel's Series A stockholders, by diverting customers and fees from Simparel to Log Logistics. *Id.* at ¶¶ 5-6, 46.

In April 2012, when SBA assumed control of L Capital, it asked the two members of Simparel's three-member Board, who had been previously appointed by L Capital, to step down. *Id.* at ¶ 26. The SBA, along with the other preferred stockholders, did not appoint replacement Board members until January 2013. *Id.* Consequently, Mr. Grilli was Simparel's sole Board member from April 2012 until January 2013. *Id.* During this period, no Board meetings were held

in April, July, or October to review Simparel's quarterly financials. *Id.* at ¶¶ 73-74. Further, "no board member candidates were presented, and no financial information was distributed informally to the SBA." *Id.* at ¶ 74. Indeed, Plaintiff asserts that when financial information was distributed to other preferred stockholders, Defendants purposefully did not provide the information to the SBA under the justifications that "if they don't ask, they don't get" and "the SBA is not my partner." *Id.* at ¶ 76. Plaintiff alleges that at the time, the financial condition of Simparel was deteriorating, and Defendants purposely did not hold Board meetings and withheld this information from the SBA and other shareholders to avoid a forced dissolution of the company. *Id.* at ¶¶ 74, 102-103.

On April 15, 2013, Plaintiff filed suit against Defendants, as well as former defendants Log Logistics and MontERP Enterprises, alleging a number of causes of action under the FCA. The United States (the "Government") declined to intervene in Planitiff's action. Defendants moved to dismiss Plaintiff's claims for failure to state a claim, while Log Logistics and MontERP Enterprises moved to dismiss for lack of personal jurisdiction. In response to the parties' briefings, the Government filed a statement of interest, seeking to clarify its position on the 2009 amendments to the FCA, but taking no position on the merits of Plaintiff's claims or the motions. On January 1, 2015, the Court dismissed with prejudice Plaintiff's claims against Log Logistics and MontERP Enterprises. Additionally, the Court dismissed with prejudice Plaintiff's claims against Defendants, except the reverse false claims cause of action. The Court explained that Plaintiff had failed to allege an obligation to pay money or property to the Government, and therefore dismissed Plaintiff's reverse false claims cause of action without prejudice. On February 20, 2015, Plaintiff moved to reopen the case to file a Second Amended Complaint, alleging that Simparel was obligated to pay accrued dividends to the SBA. Defendants did not respond or oppose the motion to reopen, and accordingly, the Court reopened the case and gave Plaintiff leave to file the Second

Amended Complaint. Defendants now move to dismiss Plaintiff's remaining claims in their entirety.

## II.     Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008) (citation and internal quotations omitted). The factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). As the Third Circuit summarized: "'stating . . . [a] claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips,* 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555); *see also Covington v. Int'l Ass'n of Approved Basketball Officials,* 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and internal quotations omitted)).

However, the Third Circuit has also determined that "FCA claims must be pleaded with particularity in accordance with Fed. R. Civ. P. 9(b)." *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n. 9 (3d Cir. 2004) (citing *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir.1998)). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient

particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir.2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-224 (3d Cir.2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3 at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-277 (3d Cir. 2006) (quoting *In re Rockefeller Center Prop. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir.2002)).

Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Therefore, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*at 679. Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 211 (3d Cir. 2009). Additionally, in evaluating the sufficiency of the pleadings, a district court "may not consider matters extraneous to the pleadings . . . [although a] limited exception exists for documents that are integral to or explicitly relied upon in the complaint." *W. Pa. Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85, 97 n. 6 (3d Cir. 2010) (quoting *Burlington*, 114 F.3d at 1426) (internal quotations omitted).

**III.     Analysis**

"The primary purpose of the FCA 'is to indemnify the government--through its restitutionary penalty provisions--against losses caused by a defendant's fraud.'" *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 304 (3d Cir. 2011) (quoting *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir.2001)). In May 20, 2009, Congress substantially amended the FCA with the passage of the Fraud Enforcement Recovery Act of 2009 (the "FERA"). Pub. L. No. 111–21, 123 Stat. 1617 (2009); *Wilkins*, 659 F.3d at 303. These amendments to the FCA apply only to conduct arising after the date of enactment of the FERA, with few exceptions. Pub. L. 111-21, 123 Stat 1617 (2009) § 4(f), 31 U.S.C. § 3729 note. Because Plaintiff alleges violations of the FCA that occurred after the passage of the FERA, *see generally* Second Am. Compl., I will analyze his claims entirely under the revised FCA.

> Section 3729(a)(1)(G) of the FCA imposes liability on any person who
>
> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(G). Section 3729(a)(1)(G) is known as the "reverse false claims" section of the FCA, because it targets a defendant's "fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid." *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 514 n 12 (3d Cir. 2007); *see also* S. REP. 111-10, at 13-14 (2009)

Plaintiff's claims do not involve a false statement. Instead, he focuses on the second half of Section 3729(a)(1)(G) in alleging that Defendants knowingly and improperly avoided or decreased an obligation to pay money to the Government. Indeed, the FCA does not require that a

defendant make a false statement to the Government, rather, it is enough that a defendant knowingly and improperly avoided or decreased an obligation to pay the Government. *See* S. REP. 111-10, at 14 (2009); *see also U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 835 (7th Cir. 2011). To bring a claim under this portion of Section 3729(a)(1)(G), a plaintiff must allege that (1) there is an obligation to pay or transmit money or property (2) to the Government, which the defendant (3) knowingly and improperly (4) avoided or decreased. 31 U.S.C. § 3729(a)(1)(G).

Here, Plaintiff alleges that the accrued dividends owed to Simparel's Series A shareholders, upon triggering payout conditions, is an obligation to pay money to the Government (the SBA).[3] Plaintiff further alleges that Defendants have avoided or prevented the payout of these accrued dividends by (1) establishing a competing company which uses Simparel's proprietary ERP software without compensating Simparel, potentially depleting Simparel's resources to the point that it would be unable to pay the dividends; (2) intentionally withholding financial information from the SBA and other shareholders to prevent them from dissolving the company and triggering payout of the dividends; and (3) failing to hold required Board meetings and intentionally delaying the appointment of new members to the Board to prevent the Board from ordering the payment of the dividends or the windup of the company, triggering the payout of the dividends. In response, Defendants contend that Plaintiff has not sufficiently alleged that an obligation, under the meaning

---

[3] Defendants argue that the SBA, in its role as receiver for L Capital, is acting only on behalf of L Capital and therefore any obligation that Defendants may have to the SBA as a shareholder is an obligation to L Capital, not an obligation to the Government. However, I need not analyze whether the obligation to pay accrued dividends to the SBA, acting as receiver for L Capital, constitutes an obligation to pay money to the Government, because, as discussed below, Plaintiff's claims do not survive this motion to dismiss on other grounds.

of the FCA, was owed to the Government. Moreover, Defendants assert that even assuming the accrued dividends constitute an obligation under the FCA, Plaintiff has not sufficiently alleged that Defendants avoided or decreased this obligation.

      a. *Obligation*

Before 2009, the FCA did not include a definition of the term "obligation." 31 U .S.C. § 3729(b)(3). In the absence of an explicit definition, a number of courts held that an obligation was too "contingent" to satisfy a reverse false claim action "without proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation sufficiently certain to give rise to an action of debt at common law." *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.,* 190 F.3d 729, 736 (6th Cir. 1999); *see also U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1202 (10th Cir. 2006) ("Although a [§ 3729(a)(1)(G)] 'obligation' need not be for a precise amount in order to be actionable . . . the obligation must arise from a source independent of 'the allegedly fraudulent acts taken to avoid it.'" (citation omitted)); *U.S. ex rel. Bain v. Ga. Gulf Corp.,* 386 F.3d 648, 657–58 (5th Cir.2004) ("the reverse false claims act does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted)"); *United States v. Q Int'l Courier, Inc., 131 F.3d 770, 773* (8th Cir. 1997) ("The obligation cannot be merely a potential liability: instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness.").

In response to courts' exclusion of contingent obligations from the definition of obligation under the FCA, Congress explicitly defined "obligation" in the FERA amendment and attempted to expand that definition to include contingent obligations. S. REP. 111-10, at 14 (2009). As a

10

result, the FCA now explicitly defines an obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. 3729(b)(3). The legislative comments to the FERA explain that the new definition of obligation is intended to include "contingent, non-fixed obligations" which may "[arise] across the spectrum of possibilities from the fixed amount debt obligation where all particulars are defined to the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed." S. REP. 111-10, at 14 (2009) (citation and internal quotations omitted). Indeed, the Government, in its Statement of Interest, cites to these legislative comments in asserting that the revised FCA reaches contingent obligations. Nevertheless, however, whether the FERA amendments have expanded the scope of the reverse false claims section to include contingent obligations has not been addressed by any courts. *See e.g. U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 36 ITRD 697 (E.D. Pa. 2014); *U.S. ex rel. Boise v. Cephalon, Inc.*, No. CIV.A. 08-287, 2015 WL 4461793, at *1 n 1 (E.D. Pa. July 21, 2015). Regardless, I need not reach this issue here, because even if a showing of contingent obligation suffices, the obligations alleged by Plaintiff are too speculative to rise to the level of contingent obligations.

Here, Plaintiff asserts that the alleged accrued dividends owed to the SBA as a preferred stockholder, payable upon either 1) declaration by the Board or 2) an involuntary or voluntary liquidation and wind up of the company, constitute an obligation under the meaning of the FCA. Defendants, to the contrary, argue that payment of the accrued dividends is too speculative to be considered a contingent obligation. As Defendants point out, Plaintiff has not alleged that the Board declared or planned to declare the payment of the accrued dividends. Additionally, Plaintiff

11

has not alleged that Simparel has entered into voluntary or involuntary liquidation, dissolution or wind up, or that any such events were or are likely to occur. Under the facts alleged by Plaintiff, it is entirely possible that the triggering events for payment of the accrued dividends may never come to pass. Defendants argue that even assuming contingent obligations qualify as a foundation for a reverse false claim, because the duty to pay the dividends may never arise, it is not a contingent obligation, but rather a purely speculative obligation.

Typically, before the passage of the FERA amendment, cases finding contingent obligations involved obligations "arising from civil and criminal penalties that impose monetary fines after a finding of wrongdoing . . . such as the imposition of a civil penalty for an antitrust violation." *See Am. Textile Mfrs.*, 190 F.3d at 738 (fines for mismarking imported textiles were not obligations under the FCA); *see also Bain,* 386 F.3d at 657–58 (no obligation existed at the time that chemical manufacturer submitted falsified emissions records to the Environmental Protection Agency); *Q Int'l,* 131 F.3d at 773 (8th Cir. 1997) (defendant did not owe obligation under the FCA to pay full United States domestic postage rates for letters that it diverted through Barbados). In these cases, no fee was owed to the Government at the time the defendant made a false statement to the Government, but the act of making the false statement itself could potentially result in fines or penalties if the Government chose to prosecute the defendants. *See Bahrani*, 465 F.3d at 1195 (citing *Bain*, 386 F.3d at 657; *Am. Textile Mfrs.*, 190 F.3d at 738; *Q Int'l*, 131 F.3d at 773; *U.S. ex rel Huangyan Imp. & Exp. Corp. v. Nature's Farm Products, Inc.*, 370 F. Supp. 2d 993, 1000 (N.D. Cal. 2005)).

Indeed, the Tenth Circuit highlighted this distinction in *Bahrani*, a case where an exporter was accused of violating the reverse false claims section of FCA by falsifying export certificates. *Bahrani*, 465 F.3d at 1192-4. The *Bahrani* court found that no FCA obligation existed *vis-à-vis*

any fines that the Government might levy against defendants for falsifying the export certificates, because the fines were not an existing duty to the pay the government at the time the false statements were made. *Bahrani*, 465 F.3d at 1200. However, the *Bahrani* court did find that a FCA obligation existed where the exporter should have paid a fee to obtain updated export certificates from the United States Department of Agriculture, but instead falsified the certificates to avoid this fee. *Bahrani* , 465 F.3d at 1202-03. The *Bahrani* court explained that these facts were different from those before the *American Textile Manufacturers* and *Q International* courts, because defendants were falsifying documents in an attempt to avoid a debt to the Government that already existed. *Bahrani*, 465 F.3d at 1202-03.

The legislative comments to the FERA amendments clarify that the new definition of obligation is specifically intended to capture facts like those in *American Textile Manufacturers*, where importers mismarked the country of origin of their products to conceal illegal goods and avoid paying customs duties. S. REP. 111-10, 24 n. 10, 2009; *see also Am. Textile Mfrs*, 190 F.3d at 731-32. However, unlike *American Textile Manufacturers*, here, the alleged obligation does not involve the assessment of fines and penalties by the Government. *See Am. Textile Mfrs*, 190 F.3d at 731-32. Instead, the alleged obligation arises from a contractual duty that may never manifest. Plaintiff has not alleged that the Board declared, or ever planned to declare the payment of the accrued dividends. Furthermore, Plaintiff has not indicated that Simparel was ever at risk of undergoing liquidation or a windup. Indeed, Plaintiff has simply failed to allege that more likely than not, Simparel will be required to pay out the accrued dividends. In contrast, under the facts alleged in *American Textile Manufacturers*, had the Government pursued its prosecution, the defendants would certainly have been subject to numerous fines for importing illegal goods and mislabeling their products. *Id.* Plaintiff, here, has alleged nothing to support the contention that the

13

revised definition of obligation under the FCA was intended to include wholly speculative duties to pay the Government. Therefore, even assuming that the reverse false claims section of the FCA includes contingent obligations, the Court finds that the obligation alleged by Plaintiff, i.e. the payment of the accrued dividends, is too speculative to be considered an obligation within the meaning of the FCA.

  b. *Preventing or Avoiding Payment of an Obligation*

Additionally, Defendants argue that even assuming payment of the accrued dividends is an obligation under the meaning of the FCA, Plaintiff has not sufficiently alleged that Defendants' actions have prevented or decreased the payment of this obligation. Although to survive a motion to dismiss, generally a plaintiff need not "set out in detail the facts upon which he bases his claim, he must at the very least state "a plausible claim for relief." *Covington,* 710 F.3d at 118. To bring a claim under the FCA, the elements of the cause of action must be pleaded with particularity in accordance with Fed. R. Civ. P. 9(b). *Zimmer*, 386 F.3d at 242 n. 9 (citing *SmithKline*, 149 F.3d at 234). Here, Plaintiff sets out in detail the actions Defendants took, which allegedly avoided or decreased Simparel's obligation to pay accrued dividends to the Series A shareholders. However, Plaintiff has not properly alleged that Defendants' actions have prevented or decreased payment of this obligation, or that Defendants' actions were even likely to do so. Indeed, Plaintiff's allegations that Defendants have prevented or decreased the payment of the accrued dividends are too speculative to survive a motion to dismiss, and particularly the heightened pleading standard under Rule 9(b).

Plaintiff asserts three main allegations as to how Defendants have prevented or decreased the payout of the accrued dividends: (1) using Simparel's proprietary software without paying royalties could potentially deplete Simparel's resources to the point that it would be unable to pay

14

the dividends; (2) withholding financial information from SBA and other shareholders prevented them from placing the company into involuntary windup; and (3) failing to hold required Board meetings and intentionally delaying the appointment of new members to the Board prevented the Board from ordering the payment of the dividends or the voluntary windup of company. However, under all three theories of liability, Plaintiff does not actually allege that Defendants' actions prevented Simparel from being able to fully pay the accrued dividends. Rather, Plaintiff only alleges that Defendants' actions were intended to avoid payment of the dividends, and merely speculates that these actions may have had this effect.

First, Plaintiff alleges that Mr. Roth formed a competing company, misappropriated Simparel's proprietary software, and is currently in the process of looting Simparel by siphoning off customers and business. Plaintiff claims that this could prevent or decrease the payout of the dividends because "[t]he only way for the SBA to recoup the $4,016,000 million dollars invested is for Simparel to grow and prosper now that SBA is a Preferred shareholder." Second Am. Compl. ¶ 6. However, at no point does Plaintiff allege that Mr. Roth has siphoned off so much value from Simparel that the company is no longer capable of paying the full value of the accrued dividends, if the dividends ever came due. Indeed, Plaintiff has not even alleged that Simparel is currently incapable of paying the full dividend amount. Moreover, although Plaintiff attaches Simparel's September 30, 2012 financial statement as Exhibit B to his Complaint, the total assets of $3,144,783 minus the total liabilities of only $490,841 listed on this statement appear to be sufficient to cover payment of accrued dividends of $1,208,000 and $888,000. *See* Second Am. Compl. Ex. B p 1. Therefore, under the facts alleged by Plaintiff, Defendants' activities appear to have not effected Simparel's ability to pay the accrued dividends.

Second, Plaintiff alleges that Defendants withheld financial information from the SBA and other shareholders, to prevent them from discovering the nature of Simparel's deteriorating financials and declaring a dissolution of the company. However, Plaintiff has not specifically alleged that had Simparel's shareholders known the true nature of Simaprel's finances, they would have dissolved the company. Moreover, Plaintiff has not even alleged facts that would lead the Court to find that this would be a likely reaction from the shareholders. Plaintiff merely speculates that the SBA and other shareholders would declare an involuntary dissolution if they were aware of the negative financial information. Indeed, the speculative nature of Plaintiff's allegations is evidenced by the fact that although the Complaint is now publicly available to all of Simparel's shareholders, these shareholders do not appear to have made moves to dissolve Simparel, as the company is still a party to this litigation. Because Plaintiff has not plausibly alleged that the shareholders would have dissolved Simparel if Defendants had not withheld negative financial information, Plaintiff cannot claim that these actions prevented or decreased the payment of the accrued dividends.

Third, Plaintiff alleges that during the period of April 2012 through January 2013, Defendants failed to hold required Board meetings and intentionally delayed the appointment of new members to the Board. Plaintiff further claims that because the Board, along with the two missing Board members, would have declared the payment of the accrued dividends or dissolved Simparel, these actions prevented or decreased the payment of the accrued dividends. However, as with the actions of the shareholders above, Plaintiff fails to allege that had these Board meetings occurred or had these Board members been appointed, they actually would have ordered the payout of the dividends. Moreover, Plaintiff does not detail with any specificity how Defendants delayed the appointment of the new Board members. Indeed, under the facts alleged by Plaintiff, the SBA

16

and the other preferred shareholders appear to have had the sole authority to appoint new Board members, not Defendants. Because Plaintiff has not alleged any facts under which Defendants' failure to hold Board meetings or the delay in appointing Board members actually effected the payout of Simparel's accrued dividends, these facts do not state a claim under the FCA.[4]

## IV.  Conclusion

Defendants' motion to dismiss is granted.

Dated: November 19, 2015

/s/ Freda L. Wolfson
Freda L. Wolfson
U.S. District Judge

---

[4] Defendants also argue that Plaintiff does not sufficiently allege that Defendants *knowingly* violated the FCA, but I need not analyze this issue here, as Plaintiff has failed to plausibly allege that Plaintiff's actions had any effect on the payment of an obligation to the Government.

17